[No. 29844. Department Two. October 3, 1946.]

BLANCHE ADA GILLESPIE, *Respondent*, v. HARRY H. GILLESPIE, *Appellant.*[1]

*Lee Olwell*, for appellant.

*Austin F. Case* and *H. Sylvester Garvin* (*D. B. Allison*, of counsel), for respondent.

ROBINSON, J.—In this action, the trial court granted a divorce to the plaintiff wife; also, the custody of the children, as well as most of the property involved, which, for the most part, was the separate property of the defendant husband.

Appellant's present counsel first strongly represents to the court that the divorce should have been granted to his client, or, in the alternative, to both parties. It would seem from the cold record that a decree granting the divorce to both would not have been inappropriate. The testimony of each of the parties strongly tended to blast the character and conduct of the other. But appellant's counsel did not come into the case until after the trial had been held and a long and carefully prepared memorandum decision had been rendered by the trial judge, and we assume that,

[1]Reported in 173 P. (2d) 176.

except as hereinafter noted, he did not see and hear the principals testify.

We gather from various portions of the record that the action of the trial judge as to all aspects of the case was largely governed by the opinion he formed as to the character and credibility of the respective parties. For example, in his memorandum opinion, the trial judge said:

"I do not see that any useful purpose will be served by discussing in detail the grave charges made by one party against the other. Each party testified to admissions and confessions made by the other which it is somewhat difficult for the court to credit. The generality of people guilty of conduct which each claims the other freely to have confessed to the other, would in my opinion be very reluctant to admit the facts claimed by the respective parties here to have been so admitted. However, the plaintiff, in my opinion, could not have imagined all of the facts to which she testified, and in regard thereto she had some corroboration. While the defendant no doubt was not as bad as painted, I am satisfied that his conduct was far from what it should have been in regard to his attention to other women, and the plaintiff did have some corroboration on this point which the court cannot disregard. He gave his wife very grave grounds for suspicion as to his fidelity, which is about the worst form of cruelty. Therefore, I am convinced that the evidence preponderates that she has sustained her burden of proof as to the defendant's misconduct.

"On the other hand, the defendant's testimony rests wholly in his claim of admissions made to him by the plaintiff. He has not sustained the burden of proving the allegations of his cross-complaint.

"The divorce will be granted to the plaintiff and denied to the defendant on his cross-complaint. The custody of the children will be awarded to the mother with the right of reasonable visitation to the father."

We have concluded that we would not be warranted in disturbing the trial court's decree in so far as it grants the divorce to the wife, and, since this is peculiarly a case where the welfare of the children is the chief concern, we will so rule on that point without discussing the charges and countercharges of their parents and thereby making them of wider public record.

The parties to this action were married in 1927. It was the wife's first marriage, and the husband's third. At the time of the trial, she was thirty-eight years of age, and he was fifty-seven, a difference of nineteen years, a fact which, in some degree, may have affected the trial court's disposition of the property and the custody of the two children, Rolland and Sheila. Rolland became seventeen years of age, and Sheila, eleven, before the interlocutory decree was entered. It is said in the court's memorandum opinion:

"The learned counsel for the respective parties, with a high sense of their responsibility, stipulated that the children should not be present at the hearing and that the court, in the presence of the official court reporter, should interrogate them as to their preference in the matter of custody. In compliance with this stipulation I interrogated the boy and girl in chambers."

The record of the court's examination of the children, made on May 9, 1945, out of the presence and hearing of counsel for both parties, but by their consent made a part of the statement of facts, is as follows:

"ROLAND GILLESPIE was interrogated by the Court as follows:

"Q. What is your name? A. Roland Gillespie. Q. And you are living with your mother? A. Yes. Q. What year are you in school? A. Junior. Q. Your mother and father don't seem to be able to get along? A. No. Q. And you of course understand the law, if there should be a divorce, where a person is under twenty-one the Court is required to give the custody to one or the other. Generally the Court considers the preference of the child. Would you rather be with your father or mother? A. I would rather stay with my mother. Q. And your opinion is then that they are so far in disagreement that there is no chance of them to be happy together? A. Their age is so far apart and their ideas are not the same."

The transcript of the court's examination of Sheila reads as follows:

"Q. How old are you? A. Ten. Q. When will you be eleven? A. In August. Q. Where do you live? A. 4202 Ashworth Avenue. Q. And you are living with your mother? A. Yes. Q. Where does your papa live? A. I

don't know. Q. Hasn't he been out to see you? A. No. Q. He has not been to see you? A. No. Q. How long has he been away? A. I don't know exactly. Q. About a year or do you know when he went away? A. No, I do not. Q. Along about last July I think they said. That is about right, is it? A. Yes. Q. And you do not think your mama and papa get along very well? A. No. Q. That is they don't seem to agree very well. Is that it? A. Yes. Q. Well, you know sometimes when people can't get along and the Court gives them a divorce, then they are separated and then the Court has to decide which one the children will go with. What would you rather be, with your mama or your papa? A. My mother. Q. She treats you nicely? A. Yes. Q. And takes good care of you? A. Yes. Q. You say your papa has not been out to see you? A. No, not at our house. Q. Did he see you any other place? A. Well, I come down to his job. Q. Where is that, at Woolworth's? A. Yes. Q. Does he give you some money or presents? A. Yes, he gives me some money. Once he gave me $20. Q. Well, that was nice. Of course you love your papa and mama both? A. Yes. Q. But if they are going to be apart you would rather be with your mama? A. Yes."

As a result of this examination of the children, and for numerous other reasons, the court concluded to award their custody to their mother. The eleven-year-old daughter presented the real problem. Rolland was already making his own way, being employed by the same firm by which his father was employed, and earning, during the school period of the year, eighty dollars per month, and during vacation, thirty-nine dollars per week.

Under the circumstances, it was natural that the award of the custody of the children, and particularly that of the eleven-year-old daughter, should, to a large extent, control the division of the property. The principal item was the family home, alleged by the plaintiff to be worth eight thousand dollars; according to the defendant's testimony, five thousand dollars; and "conservatively" valued by the trial judge, after having, with consent of counsel for both parties, visited the premises in company with a real estate expert, at seventy-five hundred dollars, subject to a mortgage as to which seven hundred dollars remained unpaid.

There was also a suburban property valued by the court at nine hundred dollars; cash in bank, five hundred seventy-five dollars; household furniture, one thousand dollars; and automobile, four hundred dollars. These were the values found in the court's memorandum decision. After deducting the mortgage obligation, the net total is $9,675. In that decision, the court said:

"The plaintiff will be awarded the home and the furniture therein; the rest of above property to go to the defendant."

It was also directed in that decision that the defendant should contribute to the plaintiff, for the support of Sheila, thirty dollars per month until the further order of the court, and that plaintiff should be awarded an attorney's fee of one hundred dollars. The defendant-appellant, being dissatisfied with the result of the trial, dismissed his attorneys and employed his present counsel who, in due course, filed a motion for judgment notwithstanding the court's memorandum opinion, praying that the divorce be granted to the defendant; that the home be ordered sold, and the proceeds be placed in a trust fund for the education and support of Sheila; that the balance of the property be divided equally between the plaintiff and the defendant; and, in the alternative, that the defendant be granted a new trial on the ground that the evidence did not justify the entry of a judgment, as directed in the memorandum opinion, and on the further ground of newly discovered evidence.

The memorandum opinion hereinabove referred to was handed down on May 15, 1945. The motion for judgment notwithstanding and, in the alternative, for a new trial was filed on June 11th. The motion was supported by several affidavits. One, executed by the defendant on June 8th, stated, in substance, that, since the trial, Rolland had decided to enlist in the navy and would no longer be in charge of his mother; that, subsequent to the trial, the plaintiff had completed arrangements to sell the home for $11,500; that she had expressed a desire that he place Sheila in a boarding school; that he had made an investigation of boarding schools and had selected one as suitable for their minor

daughter where the cost would be approximately fifteen hundred dollars a year, and, as she would need seven years to finish her primary and high school education, that the approximate cost would total $10,500.

The defendant suggested that suitable provision be made for the support and education of his minor daughter (evidently from the proceeds of the sale of the house), and that the remainder of the community property should be sold and divided equally. He further asserted a claim to some machine tools, engineering equipment, and textbooks, of the value of four hundred dollars, which, he stated, the plaintiff had caused to be sold. This proposition, if agreed to, would, as we understand it, relieve the defendant from the liability of paying thirty dollars per month for the support of his daughter.

Subsequently, another affidavit was filed, executed by the defendant on June 20th, in which, referring to the fact that the court had indicated in its memorandum opinion that he would be required to pay thirty dollars per month for the support of Sheila, he stated that his salary was two hundred fifty dollars per month, with a reduction for taxes of $57.50, leaving him a net of $192.50. This was followed by a detailed average of his monthly expenses totaling $226.75.

Another affidavit was filed in support of the motion, this being made by Rolland on June 20th, to the effect that he had been rejected by the navy on account of color blindness, and that he intended to live with his father after July 1st, stating that the change was made with his mother's consent, and because she intended to sell the house.

It appears from the record that the trial judge called the parties before him for hearing on July 30th. A further supporting affidavit, executed by the appellant's mother, was filed that day, stating that, since the trial, the plaintiff had been flirting with a masseur, and also with a truck driver from whom she had already received a proposal of marriage.

A transcript of the hearing, held on July 30th, has been made a part of the statement of facts. It shows a long colloquy between court and counsel. Rolland was called and

sworn as a witness. The record of his testimony fills eighteen pages of the statement. Much of it concerns matters of but slight importance. The salient points were that he had all along, and still, intended to live with his mother, and as to why he made the affidavit filed in support of the motion.

At the time of the trial, four young women were living on the top floor of the Gillespie house, each paying a rental of twenty dollars per month. It was brought out in Rolland's examination that one of these tenants had left, reducing his mother's income by twenty dollars monthly; also that his sister Sheila had a slight heart murmur or leakage, an after-effect of tonsilitis; also, that he was giving his mother ten dollars per month and had accumulated some war bonds.

At this hearing, the plaintiff was recalled and interrogated at length (ten pages). She testified, among other things, that she had thought it best to sell the house and supposed she had the right to do so, and that she had sold a rug for $212 in order to pay overdue house bills; also, that physicians had told her that Sheila's heart trouble was serious, but curable, if she was carefully protected from overexertion and afforded a special diet. She further testified that, while she had favorably considered the boarding school idea, she had not made up her mind about it.

The hearing of July 30th was continued until the fourth of August. By that time, defendant's counsel had procured a complete transcript of the testimony given at the trial and, in the course of a lengthy argument which is made part of the statement of facts, read large sections thereof to the court. After so doing, he suggested to the court:

"That the separate property, the home and furnishings be awarded to the defendant; that he would thereby be able to keep Sheila in boarding school or to send her to school because he would save his present monthly rental that is shown in the record to be some $50 or $52 a month; and he would have the income from the upstairs portion of the house that is now being received in the amount of $80 per month or $60 as it is apparently at present. In that event the defendant could probably borrow sufficient to pay to the plaintiff, a thousand dollars in cash and another thousand over a period of two or three years which would provide

her some income. . . . In the alternative, your Honor, and thinking solely of the protection of this little girl, the proposition would be that the property be sold and that from the proceeds—The Court: All the property? Mr. Olwell: No, your Honor. The Court: Just the home. Mr. Olwell: Just the home. I should have been more exact. That the home be sold and that from the proceeds of the sale of the home a sufficient amount be put in trust to insure this little girl's education through high school."

At the conclusion of the argument, the trial judge said that he had taken something like a hundred pages of notes at the trial and had felt such concern about the matter that he had spent several hours in going over them with one of the senior judges before preparing his memorandum decision. He asked defendant's counsel for his copy of the transcript of the evidence so that he might give it further examination, at the same time reminding both counsel that, until a decree was finally entered, defendant should pay plaintiff one hundred dollars per month, as required by an order issued at the time the action was filed. Two weeks later, he filed a memorandum decision as to the motion for judgment notwithstanding the memorandum opinion and, in the alternative, for a new trial. This, the second memorandum opinion, reads, in part, as follows:

"At the conclusion of the trial in the above-entitled action on the 9th day of May last, the then counsel for the parties submitted the matter to the court without argument. Thereafter, on the 15th day of May, 1945, the court filed herein his memorandum opinion, and thereafter the defendant, feeling himself aggrieved, secured new counsel and filed the motions which are the occasion for this memorandum opinion. In the meantime it appears that the plaintiff, in ignorance of the fact that she was not authorized to do so until the findings of fact, conclusions of law and interlocutory decree had been entered, attempted to sell the home property and had negotiated a sale, including some small part of the household furniture, for the sum of $11,000.

"It further was brought to the attention of the court that the son, Roland Harry Gillespie, had made an affidavit on the 20th of June last, stating that he intended to reside with his father from and after July 1, 1945. However, it developed on further hearing held before this court on the 30th day of

July, 1945, that he had been induced to sign the affidavit by a misrepresentation made by the defendant to the effect that it was not for the purpose of changing the trial in any way, but was to protect the defendant so that the mother wouldn't make charges against the father for trying to take the boy away from her. The present counsel for defendant had nothing whatever to do with this misrepresentation, however, but it does not place the defendant in a particularly good light before this court. I may add that I am disappointed at the failure of the plaintiff to try to secure any employment.

"The defendant has prepared a full transcript of the proceedings and his counsel spent quite an extended time arguing that the disposition proposed by the court in its first memorandum opinion was inequitable. On further reflection, I am inclined to think that I should revise my original disposition of the property rights of the parties. The divorce, I am still satisfied, should be to the plaintiff, and the custody of the children, as originally determined, should be to the plaintiff."

The opinion then discussed the disposition of the property made in the former memorandum and went on to direct a somewhat different disposition, which is reflected by the following portion of the decree subsequently entered:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff be and she hereby is awarded the cash in the bank in the sum of $575.00, and the household furniture and home at 4202 Ashworth Avenue, otherwise described as Lot Six, Block One, Edgewater Second Addition to the City of Seattle, provided that if she remarries or ceases to use the same as a home for herself and minor daughter within eight years from date hereof, the same shall be sold and the net proceeds divided equally between the parties, or if the plaintiff sells the same within said period, a like disposition shall be made of the proceeds of such sale. If the defendant be alive at the end of eight years from the date hereof, then, in that event, the property shall be sold and the proceeds divided as above. If the plaintiff dies within the eight years and the defendant survives, then the property shall vest in him. The defendant shall not be required to pay off the mortgage on the home.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant be and he hereby is awarded his machine tools,

engineering equipment and textbooks and the Chevrolet automobile of the parties.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the property known as the Pine Lake property, otherwise described as Lots 24, 25 and 26, Block 1, Pine Crest unrecorded Addition, including shorelands adjacent, in King County, Washington be sold and the proceeds divided equally between the parties."

The appellant calls attention to Rem. Rev. Stat., § 989 [P.P.C. § 23-23], wherein it is provided that, in granting a divorce, the court shall make such disposition of the property of the parties "as shall appear just and equitable," and contends that the disposition made by the trial court is manifestly inequitable because the home, which is the principal item, was the separate property of the husband, and its furniture, almost wholly so. It is further stressed that the appellant is approaching sixty years of age, and, therefore, the period where his earning power will rapidly diminish, while the respondent is but thirty-nine. These contentions would have great force if the parties were childless, and especially since neither party was without fault.

The principal question before the court was: Which of the parties shall be given the custody of the daughter? The answer to that question necessarily largely controls the disposition of the property. The appellant's own contentions tacitly admit that substantially all of the property should be devoted to Sheila's support and education. In this connection, the appellant's brief says of the decree appealed from:

"There is nothing to prevent respondent from making a purported sale of the property for a relatively nominal figure, and thus deprive appellant from any interest in the property and deprive the minor daughter of any protection whatsoever."

If we affirm the interlocutory decree, it would seem that the respondent will receive full legal title to the home. It would at least be difficult to demonstrate that the appellant would retain any classifiable legal interest in it. But the wording of the decree is such that it seems impossible that a searcher of title for a prospective purchaser would permit

his client to purchase the property without securing some sort of consent of the appellant to the transaction. If appellant lives eight years, he will be entitled to one half of the sale price of the home, or even before eight years, if the respondent marries or ceases to use the same as a home for herself and daughter. If respondent dies within eight years, the whole of the property will vest in appellant.

The case is so complex that we venture to say, if five lawyers were given the record without the trial court's memorandum opinions and its findings of fact, conclusions of law, and decree, and each asked to independently draft a decree in the case, that there would be a wide divergence of opinion, and that no two of the decrees would agree. There is a familiar formula beginning: "The trial court saw and heard the witnesses," and so forth. Throughout, and at all stages of, this review, we have felt the handicap of not having seen the parties to the action or heard them testify. We have reviewed but few, if any, cases where that formula is more plainly applicable than it is in this.

■ This case was tried by an experienced trial judge, and with outstanding care and patience. At his own suggestion, but with the consent of counsel, he visited the home of the parties with a qualified real estate expert and appraised the property. With like consent, he interrogated the children in his chambers. At the close of the trial, he promptly prepared a comprehensive and analytical memorandum decision. Defendant, being dissatisfied, employed other counsel who made the usual post-trial motions. Although defendant's case had been well and thoroughly presented on the trial, the court opened the case for further trial, and much additional oral evidence was taken. The decision turns largely upon the appraisal of the personalities of the adverse parties. We have but scant opportunity to judge as to that,—nothing more than a typewritten record of the trial. Under these circumstances, we would not be warranted in setting aside or amending the decree entered by the trial judge.

The decree appealed from is affirmed.

BEALS, C. J., JEFFERS, and CONNELLY, JJ., concur.